**Donald LAND, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 82A04–0304–CR–176.**

Court of Appeals of Indiana.

Jan. 21, 2004.

Transfer Denied April 23, 2004.

Matthew Jon McGovern, Evansville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

Donald Land appeals his convictions for arson as a class B felony[1] and arson as a class D felony.[2] Land raises three issues, which we restate as:

I. Whether Land's due process rights were violated when the State failed to preserve evidence of alleged accelerant on the arson victim's shoes;

II. Whether the trial court violated the Indiana Constitution's prohibition against double jeopardy by entering judgment of conviction upon arson as a class B felony and arson as a class D felony; and

III. Whether the trial court erred when it allowed the State to add an habitual offender enhancement seven months after the original omnibus date.

We affirm.

The relevant facts follow. In November 2001, Land and his wife, Mayme Eaton, were in the process of divorcing. Eaton began having an affair with Land's neigh-

---

1. Ind.Code § 35–43–1–1(a) (Supp.2001) (subsequently amended by Pub.L. No. 123–2002, § 36 (eff. July 1, 2002)).

2. I.C. § 35–43–1–1(d).

bor and friend, Chris Griffith. Eaton had moved some of her possessions into Griffith's house, and Land learned of the affair. On November 18, 2001, Land told Griffith that he "was a piece of shit and [he] was lucky that [Land] didn't beat [his] head in with a baseball bat." Transcript at 215. Land also told his neighbors, Don and Janeta McNeele, that Griffith was "messing with [his] wife" and that Land would "just do something to his house. [He would] burn his house down." *Id.* at 360.

The next day, Chad Owens, who was living with Land, heard Land and Eaton arguing. When Eaton left the house, Land followed her outside. Eaton and Land continued to argue outside, and Eaton went to Griffith's house. A few minutes later, as Eaton and Griffith were walking to Griffith's truck, Eaton and Land began arguing again. Eaton and Griffith then left to visit a friend who lived a couple of blocks away.

When Land returned to his house, he asked Owens to talk with him on the porch. As they talked on the porch, Owens noticed a "flickering" in the window of Griffith's house. *Id.* at 168. Land and Owens walked to Griffith's house, and Land looked in the window. Land said that the couch was on fire and told Owens to call 9–1–1. Land and Owens went into the house to see if anyone was in the house and attempted to extinguish the fire. They also tried to pull the couch out of the house. When the fire department arrived, Land went to tell Eaton and Griffith about the fire. When Land arrived where Eaton and Griffith were visiting their friend, he kept telling Griffith "that he didn't do it." *Id.* at 205.

While the fire was being extinguished, Land asked Owens "to leave out the part about him going outside," but Owens refused. *Id.* at 177. Fire Investigator Jesse Storey arrived on the scene with his accelerant-detecting canine. The canine is trained to recognize petroleum-based accelerants. The canine "alerted on" Griffith's shoes. *Id.* at 292. Storey requested that Griffith let him perform additional testing on his shoes, and Griffith consented. Storey tested the shoes with an electronic hydrocarbon detector, and the test results were negative. Storey then collected Griffith's shoes in a sealed container. However, Storey determined that the soles of Griffith's shoes were manufactured "using a type of solvent that was a flammable and detectable by the canine but not sufficient to be detected by the electronic detector." *Id.* at 304. Storey then returned the shoes to Griffith.

The canine also gave a "slight alert" on the exposed foam rubber of the couch. *Id.* at 294. However, the couch's foam rubber is "a petroleum based product and when burnt, gives off some of the same type of byproducts as found in some common accelerants." *Id.* at 295. Storey determined that the origin of the fire was in the center cushion of the sectional couch. He found no evidence that Griffith had removed any possessions from the residence before the fire. Storey found no evidence that the fire was accidental. Rather, Storey concluded that the fire was intentionally set. However, he found no evidence that an accelerant was used to start the fire.

The State charged Land with arson as a class B felony and later added a charge of arson as a class D felony. The trial court set the omnibus date for February 1, 2002.[3] Land filed a motion to dismiss

---

**3.** According to Ind.Code § 35–36–8–1(a) (1998), the omnibus date: (1) must be set by the judicial officer at the initial hearing; and (2) must be no earlier than forty-five (45) days and no later than seventy-five (75) days after the completion of the initial hearing, unless

alleging that the State failed to preserve exculpatory evidence, specifically, alleged accelerants on Griffith's shoes. However, the trial court denied the motion.

On September 4, 2002, the State filed an habitual offender enhancement. Land objected to the filing as being untimely, but the trial court granted the State leave to file the habitual offender enhancement. Land later filed a motion to dismiss the habitual offender enhancement, but the trial court denied the motion.

While incarcerated pending trial, Land wrote several letters to friends asking them to tell the prosecutor and Land's attorney that Griffith and Eaton had set Land up. Land offered the friends various pieces of equipment in exchange for their help.

The jury found Land guilty of arson as a class B felony and arson as a class D felony. Land admitted to his status as an habitual offender. The trial court sentenced Land to the Indiana Department of Correction for twelve years for the arson as a class B felony conviction, enhanced by ten years for Land's status as an habitual offender, and one year for the arson as a class D felony conviction. The trial court ordered that the sentences be served consecutively.

### I.

The first issue is whether Land's due process rights were violated when the State failed to preserve evidence of alleged accelerant on Griffith's shoes. Land argues that the evidence of accelerant on Griffith's shoes was materially exculpatory and that the trial court erred by denying his motion to dismiss. In the alternative, Land argues that the evidence of acceler-

ant on Griffith's shoes was potentially useful and was destroyed in bad faith.

 To determine whether a defendant's due process rights have been violated by the State's failure to preserve evidence, we must first decide whether the evidence in question was "potentially useful evidence" or "materially exculpatory evidence." *Chissell v. State*, 705 N.E.2d 501, 504 (Ind.Ct.App.1999), *trans. denied.* Potentially useful evidence is defined as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), *reh'g denied*). The State's failure to preserve potentially useful evidence does not constitute a denial of due process of law "unless a criminal defendant can show bad faith on the part of the police." *Id.* "Bad faith is defined as being 'not simply bad judgment or negligence, but rather implies the conscious doing of wrong because of dishonest purpose or moral obliquity.'" *Wade v. State*, 718 N.E.2d 1162, 1166 (Ind.Ct.App.1999), *reh'g denied, trans. denied.*

 On the other hand, materially exculpatory evidence is that evidence which "possesses an exculpatory value that was apparent before the evidence was destroyed" and must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Chissell*, 705 N.E.2d at 504 (quoting *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984)). "Exculpatory is defined as '[c]learing or tending to clear from alleged fault or guilt;

the prosecuting attorney and the defendant agree to a different date. The "purpose of the omnibus date is to establish a point in time

from which various deadlines under this article are established." I.C. § 35–36–8–1(b).

excusing.'" *Wade*, 718 N.E.2d at 1166. The scope of the State's duty to preserve exculpatory evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." *Noojin v. State*, 730 N.E.2d 672, 675 (Ind. 2000). Unlike potentially useful evidence, the State's good or bad faith in failing to preserve materially exculpatory evidence is irrelevant. *Chissell*, 705 N.E.2d at 504.

█ Land argues that the alleged evidence of accelerant on Griffith's shoes was materially exculpatory. Specifically, Land argues that his defense was predicated upon a theory that Griffith set the fire for financial gain. Land relies upon *Roberson v. State*, 766 N.E.2d 1185 (Ind.Ct.App. 2002), *reh'g denied, trans. denied.* In *Roberson*, the defendant was an inmate in a county jail. *Id.* at 1186. He was found in possession of "two wooden sticks wrapped on the one end and sharpened to a point on the other end," and the State charged him with possession of a dangerous device or material by a prisoner. *Id.* Prior to trial, the State discarded the device. *Id.* However, a poor quality picture of the device existed. *Id.* The defendant filed a motion to dismiss, which the trial court denied. *Id.* at 1186–1187.

On interlocutory appeal, this court reversed, holding that the evidence was materially exculpatory. *Id.* at 1189. Specifically, we held that the evidence of "the character of the device is the sole basis of the defendant's defense." *Id.* at 1188. The defendant could not "secure comparable evidence by other reasonably available means." *Id.* at 1189. As for whether the device had an exculpatory value that was apparent before its destruction, the State pointed to the testimony of three government officials who each opined that the device was fashioned to be a weapon and was capable of causing bodily injury. *Id.* We held that:

Under the specific circumstances of this case, however, these are clearly subjective opinions. It is a troubling prospect when the primary evidence is lost or destroyed while in the care of the State, and the State is then permitted to argue that the evidence had no exculpatory value because government officials "knew" that the device was indeed a weapon.

As noted previously, the device was allegedly fabricated from items that Roberson was allowed to possess in his cell—items that have legitimate uses and that are generally not construed as weapons. It is certainly conceivable that had Roberson and the trier of fact been able to examine the device, a different conclusion regarding its intend (sic) use and ability to cause bodily injury might have been reached. Therefore, we conclude that there is some indication that the evidence possessed an exculpatory value that, however tenuous, was evident to the State prior to its destruction. Without such evidence, Roberson is faced with the monumental task of presenting a defense in which he is obliged to accept the subjective opinions of three government officials. Under the specific circumstances of this case, we hold that it would be fundamentally unfair and a violation of due process to allow the State to proceed in this manner.

*Id.* at 1189–1190 (internal citations omitted, footnotes omitted).

Land argues that, as in *Roberson*, the shoes were materially exculpatory because the evidence was crucial to his defense. Land argues that his "entire defense was premised on the theory that Griffith started the fire for financial gain." Appellant's Brief at 9. Further, Land argues that the fact that additional tests were needed to confirm the presence of an accelerant does not transform Griffith's shoes into poten-

tially useful evidence instead of materially exculpatory evidence.

The State argues that *Roberson* is distinguishable because, unlike the device in *Roberson*, Griffith's shoes were not critical to either the State or the defense. According to the State, Griffith's shoes were neither material nor exculpatory. The State contends that "[w]hether the soles of Griffith's shoes had some kind of accelerant on them would not have made a difference in the outcome of the trial because the evidence showed that the fire was not ignited by use of an accelerant." Appellee's Brief at 9. Moreover, the State argues that Land's defense was based primarily upon a claim that he was not alone long enough to start the fire and that he attempted to put the fire out when it was discovered.

We agree with the State and conclude that the shoes were not materially exculpatory. Unlike *Roberson*, here, the evidence was not the sole basis of Land's defense. Moreover, because Storey determined that the fire was not set with the use of accelerants, even if accelerant was on Griffith's shoes, the shoes were not exculpatory. The shoes more closely fit the definition of potentially useful evidence, which is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Chissell*, 705 N.E.2d at 504. The shoes could have been subjected to additional tests, the results of which might have assisted Land in his defense. Thus, the shoes are, at most, potentially useful evidence not materially exculpatory evidence.

■ As noted above, the State's failure to preserve potentially useful evidence does not constitute a denial of due process of law "unless a criminal defendant can show bad faith on the part of police." *Id.* The State argues that Land failed to demonstrate bad faith on the part of the State. We agree. As noted above, bad faith is defined as "not simply bad judgment or negligence, but rather implies the conscious doing of wrong because of dishonest purpose or moral obliquity." *Wade*, 718 N.E.2d at 1166. Land argues that Storey deliberately destroyed the evidence because of "moral obliquity." Appellant's Reply Brief at 3. We find no evidence in the record to support this assertion. Rather, the evidence demonstrates that Storey returned the shoes to Griffith after concluding that the canine's alert was caused by accelerant used in the manufacturing process of the shoes. Land's due process rights were not violated, and the trial court did not err by denying Land's motion to dismiss. *See, e.g., Chissell*, 705 N.E.2d at 504 (holding that the defendant was not denied due process where the evidence was not materially exculpatory and the defendant failed to demonstrate bad faith on the part of the police).

## II.

■ The next issue is whether the trial court violated the Indiana Constitution's prohibition against double jeopardy by entering judgment of conviction upon arson as a class B felony and arson as a class D felony. Land argues that he was subjected to multiple punishments for the same offense by the judgments of conviction and the sentences for arson as a class B felony and arson as a class D felony. The arson as a class B felony conviction related to the fire damage to Griffith's residence, while the arson as a class D felony conviction related to the fire damage to Eaton's property.

The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. Our supreme court has held that "two or more offenses are the 'same of-

fense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State,* 717 N.E.2d 32, 49 (Ind.1999). Land argues that his convictions violate the "actual evidence" test, not the "statutory elements" test.

■ "An offense is the same as another under the actual evidence test when there is a reasonable possibility that the evidence used by the fact-finder to establish the essential elements of one offense may have been used to establish the essential elements of a second challenged offense." *Id.* at 53. However, our supreme court clarified this test in *Spivey v. State,* where it held that "[t]he test is not whether the evidentiary facts used to establish one of the essential elements of one offense may also have been used to establish one of the essential elements of a second challenged offense; rather, the test is whether the evidentiary facts establishing the essential elements of one offense also establish all of the elements of a second offense." 761 N.E.2d 831, 833 (Ind.2002). If the evidentiary facts establishing one offense establish only one or several, but not all, of the essential elements of the second offense, there is no double jeopardy violation.[4] *Id.*

Land was convicted of arson as a class B felony for knowingly or intentionally dam-

aging Griffith's residence by fire. *See* I.C. § 35–43–1–1(a). Land was convicted of arson as a class D felony for knowingly or intentionally, by means of fire, damaging Eaton's property which resulted in a pecuniary loss of at least $250.00 but less than $5,000.00. *See* I.C. § 35–43–1–1(d). The evidentiary facts of Land's class B felony conviction do not establish all of the elements of his class D felony conviction. Specifically, the class B felony conviction required evidence that Griffith's residence was damaged by the fire, while the class D felony conviction required evidence that at least $250.00 but less than $5,000.00 of Eaton's property was damaged by the fire. Land's convictions arise from a situation where separate victims, Griffith and Eaton, are involved. Our supreme court has held that such a "scenario ... does not constitute double jeopardy." *Bald v. State,* 766 N.E.2d 1170, 1172 n. 4 (Ind. 2002) (citing *Richardson,* 717 N.E.2d at 56 (Sullivan, J., concurring)). Consequently, Land's convictions for arson as a class B felony and arson as a class D felony do not violate Indiana's prohibition against double jeopardy. *See, e.g., Bald,* 766 N.E.2d at 1172 (holding that the defendant's convictions for three felony murders and one count of arson did not violate the prohibition against double jeopardy).

### III.

■ The next issue is whether the trial court erred when it allowed the State to add an habitual offender enhancement sev-

---

4. Land relies upon *Belser v. State,* 727 N.E.2d 457 (Ind.Ct.App.2000), *trans. denied.* In *Belser,* another panel of this court held that the prohibition against double jeopardy was violated by a defendant's conviction for five counts of arson as class B felonies. *Id.* at 462. The defendant was charged with five separate counts because he had set a fire that damaged a residence and endangered four people. *Id.* 460–61. The panel held the con-

victions violated the prohibition against double jeopardy under both the statutory elements test and .the actual evidence test. However, as noted above, our supreme court has clarified the actual evidence test since the panel's holding in *Belser. See Spivey,* 761 N.E.2d at 833. Given our supreme court's clarification of the actual evidence test, we decline to rely upon *Belser.*

en months after the original omnibus date. Ind.Code § 35–34–1–5(e) (1998) provides that: "An amendment of an indictment or information to include a habitual offender charge under IC 35–50–2–8 must be made not later than ten (10) days after the omnibus date. However, upon a showing of good cause, the court may permit the filing of a habitual offender charge at any time before the commencement of the trial." Land requests that we reverse his habitual offender enhancement because the filing was untimely and there was no showing of good cause.

The omnibus date in this case was February 1, 2002. The State filed an habitual offender count on September 4, 2002. Land objected to the late filing, but the trial court permitted the filing of the habitual offender count. Land then filed a motion to dismiss the habitual offender count on December 11, 2002. At a hearing on Land's motion, the State presented evidence that it extended a plea agreement offer to Land in November 2001. In that offer, the State agreed not to file an habitual offender count if Land accepted the offer. Land rejected the offer, but other "plea negotiations [were] going on through March 2002 and April of 2002." Transcript at 127. Land's counsel argued that there were never "any plea negotiations in terms of offer, counter offer, counter counter offer...." *Id.* at 129. However, Land's counsel acknowledged that he would, "from time to time, attempt to solicit an offer that [he] could take back to [his] client for his consideration...." *Id.* The trial court denied Land's motion to dismiss.

By permitting the State to file the habitual offender count, the trial court impliedly found good cause. We review a trial court's finding of good cause for an abuse of discretion. *Watson v. State,* 776 N.E.2d 914, 918 (Ind.Ct.App.2002). An abuse of discretion occurs "only where the decision is clearly against the logic and effect of the facts and circumstances." *Palmer v. State,* 704 N.E.2d 124, 127 (Ind.1999). Here, the State argued that it had demonstrated good cause for the delay in filing the habitual offender count because of ongoing plea offers that were made. Although Land argues that no real plea negotiations were conducted, based upon the plea agreement offers that were made and defense counsel's acknowledgement that he attempted to solicit a plea agreement, we cannot say that the trial court abused its discretion by finding good cause in this case.[5] *See, e.g., Watson,* 776 N.E.2d at 918 (holding that the trial court did not abuse its discretion by finding good cause to allow the State to amend its charging information to include an habitual offender charge).

 Moreover, Land did not demonstrate that he was prejudiced by the late filing of the habitual offender count. A defendant who challenges the State's filing of an habitual offender allegation on the ground that it is filed outside of the time limit must demonstrate that he was prejudiced. *Daniel v. State,* 526 N.E.2d 1157, 1162 (Ind.1988) (discussing Ind.Code § 35–34–1–5(b)(1)). The purpose of Ind.Code § 35–34–1–5(e) is to allow a defendant sufficient time to prepare a defense for the habitual offender charge. *Watson,* 776 N.E.2d at 917. Land does not argue that

---

5. Land relies upon *Hooper v. State,* 779 N.E.2d 596 (Ind.Ct.App.2002). There, another panel of this court reversed a defendant's habitual offender enhancement where the filing was untimely and the State did not offer any showing of good cause for the late filing. *Id.* at 601–02. We find this case distinguishable because the trial court here did not abuse its discretion by finding good cause.

he had insufficient time to prepare his defense to the habitual offender charge. In fact, the habitual offender charge was filed in September 2002, and Land was not tried until February 2003. Because Land has not presented any explanation of how he was prejudiced by the timing of the additional charge, his request that we reverse his habitual offender enhancement on these grounds is denied. *See, e.g., Daniel,* 526 N.E.2d at 1162 (holding that the defendant failed to demonstrate that he was prejudiced by the State's late filing of its habitual offender allegation).[6]

For the foregoing reasons, we affirm Land's convictions for arson as a class B felony, arson as a class D felony, and his status as an habitual offender.

Affirmed.

BAKER, J., and BROOK, C.J., concur.

---

**6.** The State argues that Land waived this argument by failing to request a continuance in the trial court. *See, e.g., Kidd v. State,* 738 N.E.2d 1039, 1042 (Ind.2000) (holding "that once a trial court permits a tardy habitual filing, an appellant must move for a continu- ance in order to preserve the propriety of the trial court's order for appeal"). Because we have concluded that the State demonstrated good cause and that Land failed to demonstrate that he was prejudiced by the filing, we need not address the waiver issue.